UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAQUAN T. LEWIS,<br>1803 M Street NE<br>Washington, DC 20002 | ) ) ) ) | |
|       Plaintiff, | ) ) | |
| v. | ) ) | |
| THE DISTRICT OF COLUMBIA;<br>Via service on both the Office of the Mayor<br>1350 Pennsylvania Ave NW<br>Washington, DC 20004 and<br>The Attorney General of the District of Columbia<br>441 4th St NW #1100,<br>Washington, DC 20001 | ) ) ) ) ) ) ) ) | Case No.: _____ |
| PETER NEWSHAM, personally and in his<br>official capacity as Chief of the Metropolitan<br>Police Department<br>300 Indiana Avenue, NW<br>Washington, DC 20001 | ) ) ) ) ) ) | |
| WILLIAM FITZGERALD, personally and in his<br>official capacity as 5th District Commander of the<br>Metropolitan Police Department<br>300 Indiana Avenue, NW<br>Washington, DC 20001 | ) ) ) ) ) ) | |
| JOSHUA ANDERSON, personally and in his<br>capacity as a police officer;<br>Metropolitan Police Department<br>300 Indiana Avenue, NW<br>Washington, DC 20001 | ) ) ) ) ) ) | |
| JOSEPH BLASTING, personally and in his<br>capacity as a police officer;<br>Metropolitan Police Department<br>300 Indiana Avenue, NW<br>Washington, DC 20001 | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| MEGAN MULROONEY, personally and in her<br>capacity as a police officer;<br>Metropolitan Police Department | ) ) ) ) | |

300 Indiana Avenue, NW )
Washington, DC 20001 )
 )
JOHN/JANE DOES 1-5, individually and in their )
capacity as police officers/District of Columbia )
officials; )
 )
Defendants. )

## COMPLAINT

COMES NOW Plaintiff Daquan T. Lewis, by counsel, and moves this Court for an award

of legal, equitable, and declaratory relief against Defendants District of Columbia, Peter Newsham,

William Fitzgerald, Joshua Anderson, Joseph Blasting, and Megan Mulrooney in the manner and

for the reasons set forth below:

### SUMMARY OF ALLEGATIONS

1.      Plaintiff is a twenty-four (24) year old African-American male originally from

Washington, DC.  Since July 2018, he has held a D.C. Concealed Carry Pistol License and owned

a firearm that is registered with the District.  Since November 2018, he has worked as a Special

Police Officer (SPO) in the District.

2.      The District of Columbia – especially the Metropolitan Police Department—does

not like District citizens exercising their constitutional right to own a firearm.

3.      Accordingly, the named Defendants have created and maintained a policy,

practice, and custom of frequently stopping citizens—especially African-American citizens like

Mr. Lewis—who they know have concealed carry licenses, as detailed further below.

4.      From approximately October 2018 until May 2020, Plaintiff has suffered

multiple stops without reasonable suspicion by the Metropolitan Police Department (MPD).

During the most recent stop in April 2020, the MPD arrested Plaintiff unlawfully and seized his

registered firearm, ammunition, holster, concealed carry license, and firearm registration

certificate.   For over three months the District illegally possessed Mr. Lewis' license and property, before eventually returning it with no apology.

5. The Defendants thus violate the Second Amendment, Due Process Clause, Fourth Amendment, and the Equal Protection Clause; and their individual actions also violate common law protections against false arrest, etc.

6. By this lawsuit, Plaintiff hopes to enjoin the government from continuing these constitutional violations, obtain damages for his harms, and correct this ongoing disregard for the civil rights of District citizens.

## JURISDICTION AND VENUE

7. This action arises under the Civil Rights Act of 1871 (42 U.S.C. § 1983) as well as District of Columbia common law. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343, and/or 1367.

8. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391 because the events and the injuries giving rise to the claim occurred in the District of Columbia.

9. On or around November 2018, February 2019, July 15, 2019, June 5, 2020 and July 24, 2020, Plaintiff gave the District of Columbia notice of his claims pursuant to D.C. Code § 12-309.

## PARTIES

10. Daquan T. Lewis ("Plaintiff") is a resident of the District of Columbia and is over the age of eighteen (18).

11. Defendant District of Columbia is a municipal corporation of the local government of Washington, D.C., and operates and governs the Metropolitan Police Department (MPD).  In

this case, the District of Columbia acted through its agents and employees, including, but not limited to, MPD Chief Peter Newsham, Fifth District Commander William Fitzgerald, MPD Officers Joshua Anderson, Joseph Blasting, and Megan Mulrooney, among several others (herein identified as John/Jane Does 1-5).

12.     Defendant Peter Newsham is the Chief of the Metropolitan Police Department, and personally involved in and responsible for setting the policies, practices, customs, and training regimens for the organization.

13.     On information and belief, Defendant Newsham personally helped to cause the ongoing constitutional violations complained of, by setting the policies and customs for dealing with those exercising 2nd Amendment rights, failing to train officers in order to correct the known history of widespread abuses detailed below, and directing the abuses themselves.

14.     On information and belief, Defendant Newsham is a District of Columbia resident.  He is sued in his personal and official capacity.

15.     Defendant William Fitzgerald is the Fifth District Commander for the Metropolitan Police Department, and personally involved in and responsible for setting the policies, practices, customs, and training regimens for MPD's Fifth District, which includes Plaintiff's neighborhood.

16.     Defendant Fitzgerald is personally aware of the details of Plaintiff's case, since Plaintiff has written two detailed letters on the subject, which were sent to him.

17.     On information and belief, Defendant Fitzgerald personally helped to cause the ongoing constitutional violations complained of, by setting the policies and customs for dealing with those exercising 2nd Amendment rights, failing to train officers in order to correct the known history of widespread abuses detailed below, and directing the abuses themselves.

18.     On information and belief, Defendant Fitzgerald is a District of Columbia resident.  He is sued in his personal and official capacity.

19.     Upon information and belief, Defendants Joshua Anderson, Joseph Blasting, and Megan Mulrooney are residents of the District of Columbia.  At all times material hereto, said Defendants were police officers and/or employees of the MPD.  All are being sued in both their individual capacities and their capacities as police officers and/or employees of the MPD.

20.     Officer Anderson was involved in, and culpable for the claims arising out of, the incidents described below on December 12, 2018 and April 14, 2018; among others as may be determined in discovery.

21.     Officer Blasting was involved in, and culpable for the claims arising out of, the incidents described below on October 10, 2018 and April 14, 2020; among others as may be determined in discovery.

22.     Officer Mulrooney was involved in, and culpable for the claims arising out of, the incidents described below on October 10, 2018 and December 12, 2018; among others as may be described in discovery.

23.     Defendants John/Jane Does 1-5 are unknown individuals who are personally responsible for the unconstitutional and tortious actions described in this Complaint.  Plaintiff will amend this Complaint to name these Defendants when their identities become known in discovery.

## STATEMENT OF FACTS

24.     The District of Columbia has a long history of disfavoring the exercise of Second Amendment rights.  "In 1976, the District banned all handgun possession.  D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).  When that ban was struck down in *Heller I*, the Council

followed it with a ban on carrying. *Id.* § 22-4504 (2009).   And when *that* was struck down in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), the Council responded with a "good-reason" requirement, a restriction "which confine[d] carrying a handgun in public to those with a special need for self-defense." *Wrenn v. District of Columbia*, 864 F.3d 650, 655 (D.C. Cir. 2017) (emphasis in original).

25.   In *Wrenn*, the D.C. Circuit struck down the "good-reason" requirement for concealed carry licenses, holding that "[a]t the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home." *Id.* at 667.

26.   In repeated disregard for the Second Amendment, the District has maintained some of the most restrictive gun laws in the country.   *Id.*; *see also, e.g.* D.C. Code § 7-2509.07; D.C. Code § 7-2509.08(d)(2).

27.   And as limited as gun rights are generally, African-Americans have more difficulty exercising those rights than do white District residents, as highlighted by the facts set forth herein.

28.   By way of background, Plaintiff is a twenty-four (24) year old African-American male who is a lifelong resident of Washington, D.C., and more specifically the Carver-Langston neighborhood in Northeast D.C. His grandfather was a detective with the MPD, and Plaintiff himself has had aspirations to serve with the force.  As noted above, in November 2018 he obtained his Special Police Officer (SPO) license (#SPO203703) and thereafter began working armed security positions

29.   Plaintiff is currently employed as an armed Lieutenant for a local security company, in which position he oversees the private armed security provided at four separate housing complexes in southeast D.C.

30.   Plaintiff does not have, and has never had, any criminal cases or convictions on his

6

record. Plaintiff is a law-abiding, upstanding member of his community who has volunteered in a leadership role with a youth mentoring nonprofit in the District.

31. In mid-2018, Plaintiff began to take steps to exercise his Second Amendment right to bear arms, **as a means of protection** in his neighborhood and for his family and also with an eye towards developing those skills necessary to serve his community as a special police officer and perhaps ultimately as an MPD officer.

32. On or around May 1, 2018, Plaintiff submitted an Application for a D.C. Concealed Carry Pistol License. Thereafter, Plaintiff attended a Firearms Safety Training Course, as well as a Range Training & Qualification Course, and then submitted a D.C. Concealed Cary Pistol License Course(s) Completion Certificate.

33. On or around June 27, 2018, the MPD issued a Notice of Approval for a Concealed Carry Pistol License, therein noting that Plaintiff must register his firearm with the MPD before receiving his license.

34. Thereafter, Plaintiff registered a handgun with the District. On or around July 19, 2020, he received his Concealed Carry Pistol License (hereinafter "Concealed Carry License").

35. At or around this time, Plaintiff began working towards obtaining a Special Police Officer (SPO) license. On November 28, 2018, Plaintiff was issued a SPO license with an expiration date of May 31, 2020.[1] He has a registered firearm that he is permitted to use and transport for SPO purposes.

36. On or around October 10, 2018, MPD Officers Roberto Amengual, Megan Mulrooney, and Joseph Blasting, among others, stopped Plaintiff to inquire as to whether he was carrying a firearm without reasonable suspicion to do so.

---

[1] Upon information and belief, Plaintiff's SPO license was extended by virtue of a COVID-19-related order or bill, and is identified as being "Active" on the DCOPLA website.

37.     A group of officers quickly approached Plaintiff and several other African-American male bystanders, surrounding Plaintiff and asking him and all of the African-American men if they had firearms.  Other than being in an alleged high crime area, which in and of itself does not amount to reasonable suspicion, there was no other reason to support a reasonable, particularized suspicion that Plaintiff or anyone else in the group was committing a crime.

38.     District law requires a concealed carry licensee, when subjected to an investigative stop, to inform officers that he or she is carrying a concealed pistol, and "[p]resent the license and registration certificate."  D.C. Code § 7-2509.04.

39.     Surrounded by officers, all of whom were asking about firearms, Plaintiff was not free to leave.

40.     Obediently, Plaintiff immediately presented the officers with his Concealed Carry License.  The officers then asked Plaintiff if he had a firearm on his person.  Plaintiff acknowledged that he did. In fact, it was completely hidden from view and secured in a holster in a part of compression shorts he was wearing underneath his pants. The officers, who were then surrounding Plaintiff, asked where the firearm was located and Plaintiff indicated that it was in his groin area.

41.     Unfortunately, officers gained the false impression that Plaintiff was not carrying the gun in a holster.  They initially wanted to retrieve the firearm by reaching into Plaintiff's pants, but Plaintiff protested and was allowed to remove the gun from its holster and push the handle above his waistband, where an officer retrieved it, and confirmed that the firearm was in fact registered to Plaintiff.

42.     Eventually the officers returned the firearm to Plaintiff.  The officers had not asked Plaintiff if his firearm had been in a holster before he removed it from his groin area, nor did they search for a holster on his person.  The officers contacted DC Firearms Registration to advise them

8

of an alleged infraction for failure to carry the firearm in a holster.  At all material times during the unlawful stop, Plaintiff cooperated fully with the officers.

43.     On or around October 22, 2018, the MPD issued a Notice of Revocation to Plaintiff based on the October 10th incident.  The Notice stated that Plaintiff's Concealed Carry License was revoked and that he must turn in his License within fifteen days.  Mr. Lewis compliantly turned in his license.

44.     The Notice, however, failed to inform Mr. Lewis that the revocation "will take effect unless the licensee requests an appeal." 24 DCMR § 2341.3(b).  Mr. Lewis did timely appeal on or about November 5, 2020, the revocation did not take effect and he was not required to turn in his license.  *See* DCMR § 2341.3(b) ("Unless a licensee has requested an appeal pursuant to § 2341.6(b), a licensee whose concealed carry license is revoked shall return the license to the Firearms Registration Section").

45.     Thereafter, Plaintiff retained counsel to appeal the Notice of Revocation to the Concealed Pistol Licensing Review Board.

46.     When confronted with the fact that MPD should not have required Plaintiff to turn in his license, MPD eventually relented and returned it, stating that Plaintiff's Concealed Carry License would be "reinstated" during his appeal.  In fact, per the above-quoted D.C. Municipal Regulations, revocation had never taken effect, at least not validly.  Mr. Lewis retrieved his license on November 21, 2018.

47.     On or around December 12, 2018, while Plaintiff's appeal remained pending, MPD officers again stopped Plaintiff.  At least two of the involved officers in this stop—namely, Joshua Anderson and Megan Mulrooney—had stopped, or been involved in stopping, Plaintiff beforehand and knew that he had a Concealed Carry License.

48.     More specifically, shortly before said stop, there was a drive-by shooting at an intersection in the Carver Langston neighborhood.  Upon information and belief, the MPD officers had witnessed the shooting and saw the shooters escaping in a car, or at least overheard it and knew of the direction from which the shooting came.  The officers observed Plaintiff walking on the sidewalk a block away, and—despite knowing or having reason to know based upon his location that Plaintiff could not have possibly been the shooter or otherwise involved in the incident—the officers stopped Plaintiff rather than pursue the shooter.

49.     The officers ordered Plaintiff to stop, asked him if he was carrying a firearm and whether his Concealed Carry License had been reinstated, and searched him.  At all material times during the unlawful stop, Plaintiff cooperated fully with the officers.  Other than being in an alleged high crime area, there was no other reason to support a reasonable, particularized suspicion that Plaintiff was committing a crime.

50.     At or around this time, the District began threatening Plaintiff with criminal charges for failure to carry his gun in a holster.

51.     On or around February 20, 2019, Plaintiff and the MPD reached a Pre-Charge Settlement Agreement, under which Plaintiff agreed to complete a Firearm Safety Training Course and voluntarily surrender his Concealed Carry License in the District to be placed under the status of suspension for a period of six (6) months, while retaining his SPO license with all associated privileges to carry a firearm while at work, to transport a firearm to and from work, and to retain his Second Amendment rights as a D.C. citizen (e.g., to maintain a firearm in his home).

52.     In exchange, the OAG agreed not to bring charges, if Plaintiff complied with the above conditions and was not arrested or convicted on any firearm offenses.

53.     As a result of the parties' Settlement Agreement, the Review Board entered an

Order to Stay Plaintiff's appeal on or around February 27, 2019.

54.     Thereafter, the parties complied with the terms of the Settlement Agreement.  On or around August 29, 2019, the parties entered a joint Praecipe of Dismissal.

55.     The Metropolitan Police Chief rescinded the revocation of Plaintiff's concealed carry license, with prejudice.

56.     Shortly thereafter Plaintiff retrieved his Concealed Carry License from the MPD.

57.     During the pendency of the stay, however, the MPD continued to harass Plaintiff.

58.     On July 5, 2019, MPD Officer Guzman approached Mr. Lewis while he was sitting in his vehicle, and asked Plaintiff if he was carrying his firearm.

59.     Plaintiff advised the officer that he did not want to talk further, but the officer continued to stand beside his vehicle door and prevent him from leaving.  Officer Guzman, having no reasonable suspicion to approach or stop Plaintiff, nonetheless continued demanding to know— at least four times—whether Plaintiff had a firearm.

60.     Plaintiff in fact did not have a firearm on his person or in his vehicle at the time, but Officer Guzman was slow to end the unlawful stop and his harassment of Plaintiff.

61.     On or around July 15, 2019, Plaintiff—through counsel—sent a letter addressed to MPD's 5th District Commander William Fitzgerald respectfully advising him of the continued stops, asking that his civil rights be honored and requesting that his letter be circulated to the officers in the Fifth District.  Plaintiff did not receive a response of any kind.

62.     On or around April 14, 2020, MPD Officers Joshua Anderson and Joseph Blasting, among several others, approached and investigated Plaintiff's car.  When Plaintiff arrived at the scene, the officers stopped Plaintiff and immediately asked him whether he had his pistol.

63.     Despite the fact that Plaintiff's firearm was secured in a holster inside of a fully-

zipped side pocket in his jacket and completely hidden from view, and despite Plaintiff's full cooperation with the officers, the MPD officers nonetheless arrested Plaintiff, cuffed him, and confiscated his firearm, ammunition, holster, Concealed Carry License, registration certificate, and wallet.

64.     MPD returned the wallet on request but refused to discuss returning the remaining items.

65.     On or around May 9, 2020, MPD officers approached and began to peer through the windows of Plaintiff's vehicle, which at the time was parked lawfully on a street not far from his residence.  Nothing potentially illegal or suspicious was within open view to the officers. The officers then summoned a canine unit to inspect Plaintiff's vehicle.

66.     As Plaintiff arrived on the scene, the officers threatened to break into Plaintiff's car if Plaintiff did not grant them access to it.

67.     The officers claimed that the police dog had indicated that the smell of firearms was emanating from the vehicle.  Plaintiff possessed a valid SPO license and registered firearm— not to mention a valid concealed carry license and corresponding registered firearm, all of which were legal—**rendering the smell of firearms no evidence of crime at all**.

68.     Only to prevent the officers from breaking into his vehicle, Plaintiff opened up the vehicle, and thereafter the officers began to perform a search, despite having no reasonable suspicion or probable cause.  They found and confiscated a single, legal shell casing, claiming they intended to test it against ballistic data at crime scenes.

69.     On June 5, 2020, the undersigned counsel sent a letter to the MPD detailing Defendants' unconstitutional conduct and requesting Plaintiff's property be returned, among other things.

70.     On July 27, 2020, over three months after illegally confiscating Plaintiff's gun, holster, concealed carry license and registration card – and following a demand letter seeking such items submitted by an attorney hired by Mr. Lewis - MPD finally offered to return the property. Mr. Lewis successfully retrieved his belongings a few days later.

71.     In returning Mr. Lewis' license and property, MPD offered no excuse for its illegal behavior, no apology, and no promise of future change.

## COUNT I
### (Violations of 42 U.S.C. § 1983 – Procedural Due Process–
### Against the District of Columbia and Defendants Newsham and Fitzgerald)

72.     The allegations contained in the prior paragraphs are hereby incorporated into Count I as if fully set forth herein.

73.     As the District of Columbia or agencies or instrumentalities thereof, Defendants are state actors and cannot curtail the constitutional rights of its residents.

74.     Under the Second Amendment to the U.S. Constitution, Plaintiff has property and liberty interests in his firearm, firearm registration certificate, ammunition, holster, and Concealed Carry License.

75.     In October 2018, under color of law, the District unlawfully deprived Plaintiff of his Concealed Carry License by forcing him to physically turn it over to MPD custody, despite an active, ongoing appeal of the license revocation.  Mr. Lewis was only able to regain the license in November 2018, approximately a month later.

76.     From April to July 2020, under color of law, the District again unlawfully deprived Plaintiff of his Concealed Carry License by physically seizing it along with his firearm, holster, and registration certificate.

77.     The District has a policy, practice, or custom of physically depriving citizens of

their concealed carry licenses and related firearm-related property during revocation proceedings and police investigations, instead of following its written laws governing revocation procedures.

78.     When these violations—which occur repeatedly, due to line officer misunderstanding among other factors—are brought to light, the Defendants fail to train and supervise employees and agents and issue corrective instructions.

79.     This policy, practice, or custom; and the concomitant failure to train, supervise and correct, caused Plaintiff's Due Process injuries.

80.     Under 24 D.C. Reg. 2341.1 (2015), the District may only revoke a concealed carry license upon finding that the licensee no longer satisfies the qualifications or failed to comply with "one or more requirements or duties imposed upon the licensee by the Act or any regulation authorized by the Act."  The District must provide written notice of the revocation.  24 D.C. Reg. 2341.3.

81.     Under 24 D.C. Reg. 2341.5 (2015) and D.C. Code § 7–2509.05, the District "may summarily suspend or limit, without a hearing, a concealed carry license, when the Chief has determined that the conduct of the licensee presents an imminent danger to the health and safety of a person or the public."  This also requires written notice, with specific requirements.  24 D.C. Reg. 2341.6 (2015); *see also* D.C. Code § 7–2509.05(4) ("Before a limitation or revocation taking effect, the Chief shall serve a notice of intent to limit or revoke the license") and D.C. Code § 7–2502.10.

82.     Defendants have failed to comply with all of the above-cited statues and/or regulations by twice confiscating and effectively suspending or revoking Defendant's Concealed Carry License without any written findings or notice and without affording Plaintiff any opportunity for a hearing.

14

83.     The District's repeated violations and deaf ear to repeated letters from Plaintiff's Counsel demonstrates deliberate indifference to his constitutional rights.

84.     As a direct and proximate result of said violations, Plaintiff has suffered humiliation, emotional distress, inconvenience, and physical harm; lost security from the loss of his firearm, ammunition, holster, and concealed carry license for the periods stated above; general damages; and legal expenses that resulted from being arrested and having his property and license seized.

**Prayer for Relief**

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and any court costs pursuant to 42 U.S.C § 1988, and any other relief the Court deems proper.

**COUNT II**
**(Violations of the Second Amendment – Against all Defendants)**

85.     The allegations contained in the prior paragraphs are hereby incorporated in Count II as if fully set forth herein.

86.     The Second Amendment of the U.S. Constitution protects an individual's right to keep and bear arms outside the context of military service. "At the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017).

87.     The Second Amendment applies to the District of Columbia.

88.     Although *Wrenn* and related caselaw clearly established Second Amendment rights that overruled District policy on guns, the District has sought to continue the same policies, customs, and practices restricting Second Amendment rights through <u>police action on the streets</u>, because it cannot do so through explicit legislation.

15

89.     Plaintiff complied with all laws requiring registration, ownership, possession, and carrying of said firearms.

90.     The District has a policy, practice, and custom of restricting the Second Amendment rights of District residents—especially African-Americans—by conducting excessive and unlawful stops, searches, seizures against concealed-carry license holders.

91.     In fact, the Defendants repeatedly act as though an African-American citizen having a concealed-carry license independently creates reasonable suspicion for stopping that individual.

92.     When these violations are brought to light, the Defendants fail to train and supervise employees and agents and issue corrective instructions.

93.     This policy, practice, or custom and the concomitant failure to train, supervise and correct, caused Plaintiff's Second Amendment injuries.

94.     Defendants violated Plaintiff's Second Amendment rights by repeatedly stopping and searching him and his property—based simply on the fact **that he is a legal gun owner**—on at least five different dates: October 10, 2018; December 12, 2018; July 5, 2019; April 14, 2020; and May 9, 2020.

95.     Defendants also violated Plaintiff's Second Amendment rights by seizing his license in October 2018, and his license and related property  on or around April 14, 2020, without any valid reason or legal authority to do so.

96.     In effect, the District seeks to extinguish Plaintiff's Second Amendment rights through police conduct, because it cannot do so through the force of law.

97.     Defendants' repeated violations and deaf ear to repeated letters from Plaintiff's Counsel demonstrates deliberate indifference to his constitutional rights.

98.     As a direct and proximate result of said violations, Plaintiff has suffered humiliation, emotional distress, inconvenience, and physical harm; lost security from the loss of his firearm, ammunition, holster, and concealed carry license for the periods stated above; general damages; and legal expenses that resulted from being arrested and having his property and license seized.

### Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and any court costs pursuant to 42 U.S.C § 1988, and any other relief the Court deems proper.

### COUNT III
### (42 U.S.C. § 1983 – Fourth Amendment Violations – Against all Defendants)

99.     The allegations contained in the prior paragraphs are incorporated into Count III as if fully set forth herein.

100.     The Fourth Amendment to the United States Constitution prohibits unreasonable searches or seizures. A person is unreasonably seized if they are arrested and detained without probable cause or stopped without reasonable suspicion.

101.     The stops, searches, and arrests of Plaintiff, and the seizures of his property, were made without the requisite reasonable suspicion, probable cause, or other constitutionally required foundation, and were a byproduct of racial profiling.

102.     At all relevant times, Plaintiff was carrying his registered pistol in a holster on his person in a firmly secure manner that was reasonably designed to prevent loss, theft, or accidental discharge of the pistol.

103.     At all relevant times, Plaintiff was also carrying his registered pistol in a manner that was entirely hidden from view of the public.

104.    At all relevant times, Plaintiff was in compliance with all of the District's gun laws, however strict and potentially unconstitutional some of them may be.

105.    Defendants violated Plaintiff's Fourth Amendment rights by:

    a.    Stopping, or conducting an investigatory detention of, and then searching Plaintiff without reasonable suspicion on October 10, 2018;

    b.    Stopping, or conducting an investigatory detention of, Plaintiff without reasonable suspicion on December 12, 2018;

    c.    Stopping, or conducting an investigatory detention of, Plaintiff without reasonable suspicion on July 5, 2019;

    d.    Stopping, or conducting an investigatory detention of, and then searching Plaintiff without reasonable suspicion on April 14, 2020, and thereafter arresting Plaintiff without probable cause, in light of the fact the District knew his firearm was properly registered, that he had a valid Concealed Carry License, and that he was carrying it in a holster in a secured fashion;

    e.    Seizing and unlawfully retaining Plaintiff's firearm, ammunition, holster, and Concealed Carry License, and Firearms Registration Certificate from April 14, 2020 to late July 2020, without any legal basis whatsoever;

    f.    Seizing and searching Plaintiff's vehicle without reasonable suspicion, probable cause, a warrant or any other permissible circumstances on May 9, 2020.

106.    The District has a policy, practice, and custom of conducting excessive and unlawful stops, searches, seizures against concealed-carry license holders, especially African-Americans.

107.    In fact, the Defendants repeatedly act as though an African-American citizen having a concealed-carry license independently creates reasonable suspicion for stopping and searching that individual.

108.    When these violations are brought to light, the Defendants fail to train and supervise employees and agents and issue corrective instructions.

109.    This policy, practice, or custom; and the concomitant failure to train, supervise and correct, caused Plaintiff's Fourth Amendment injuries.

110.    Given the multiple constitutional violations documented above, and Plaintiff's letters on the point, the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that the District demonstrated its deliberate indifference to the need for such training and supervision.

111.    As a direct and proximate result of said violations, Plaintiff has suffered humiliation, emotional distress, inconvenience, and physical harm; lost security from the loss of his firearm, ammunition, holster, and concealed carry license for the periods stated above; general damages; and legal expenses that resulted from being arrested and having his property and license seized ("Damages").

### Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and any court costs pursuant to 42 U.S.C § 1988, and any other relief the Court deems proper.

### COUNT IV
### (Violation of 42 U.S.C. § 1983 – Equal Protection Clause – Against all Defendants)

112.    The allegations contained in the prior paragraphs are incorporated into Count IV as if fully set forth herein.

113.    The Equal Protection Clause of the Fourteenth Amendment, which applies to the District through the Fifth Amendment, mandates that the government treat similarly situated people in a similar manner.

114.    Plaintiff is similarly situated to white DC residents who lawfully possess and carry firearms.

115.    As recounted above, Defendants discriminated against Plaintiff based on his race. Had Plaintiff been white, the District would not have repeatedly stopped and interrogated him about his firearm, and on two occasions seized or revoked his Concealed Carry License.

116.    The District intentionally enforces its firearm statutes in a racially discriminatory manner by making stops, searches, seizures, and arrests of African-American males like Plaintiff because of race.

117.    White DC residents who carry firearms in public pursuant to concealed carry licenses do not face the same treatment that Plaintiff has faced since at least October 2018.

118.    The District has a policy, practice, and custom of discriminating against legal African-American gun owners by conducting excessive and unlawful stops, searches, seizures.

119.    In fact, the Defendants repeatedly act as though an African-American citizen having a concealed-carry license independently creates reasonable suspicion for stopping and searching that individual.

120.    When these violations are brought to light, the Defendants fail to train and supervise employees and agents and issue corrective instructions.

121.    This policy, practice, or custom and the concomitant failure to train, supervise and correct, caused Plaintiff's Equal Protection injuries.

122.    Defendants' repeated violations and deaf ear to repeated letters from Plaintiff's

Counsel demonstrates deliberate indifference to his Fourth Amendment rights.

123.    As a direct and proximate result of said violations, Plaintiff has suffered humiliation, emotional distress, inconvenience, and physical harm; lost security from the loss of his firearm, ammunition, holster, and concealed carry license for the periods stated above; general damages; and legal expenses that resulted from being arrested and having his property and license seized.

## Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and any court costs pursuant to 42 U.S.C § 1988, and any other relief the Court deems proper.

## COUNT V
### (Assault – Against Defendants District of Columbia, Anderson, Blasting, and John/Jane Does 1-5)

124.    The allegations contained in the prior paragraphs are incorporated into Count V as if fully set forth herein.

125.    On or around April 14, 2020, MPD officers aggressively frisked Plaintiff without reasonable suspicion and subsequently arrested Plaintiff and placed him cuffs without probable cause.

126.    Said officers acted with the intent to cause harmful or offensive contact with Plaintiff and harmful and/or offensive contact did in fact occur.

127.    MPD officers intentionally acted in a physically aggressive manner to create a state of fear or imminent apprehension of harmful or offensive contact to Plaintiff.

128.    Plaintiff believe he was in imminent danger of harmful and/or offensive contact and feared for his safety.

21

129.    Plaintiff's Damages—as defined in ¶ 111—were proximately and solely caused by the MPD officers' conduct described herein without any negligence or assumption of the risk by Plaintiff.

130.    The District of Columbia is jointly and severally liable under the doctrine of *respondeat superior* for the aforementioned tortious acts and omissions of Defendant MPD officers.

**Prayer for Relief**

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and court costs pursuant to all applicable state and federal authority, and any other relief the Court deems proper.

**COUNT VI**
**(Battery – Against Defendants District of Columbia, Anderson, Blasting, and John/Jane Does 1-5)**

131.    The allegations contained in the prior paragraphs are incorporated into Count VI as if fully set forth herein.

132.    On or around April 14, 2020, MPD officers forcefully grabbed, held, squeezed, restrained, and cuffed Plaintiff without reasonable suspicion or probable cause.

133.    MPD officers initiated said physical contact and physically harmed and/or offended Plaintiff without provocation or justification.

134.    The MPD officers' unprovoked bodily contact with M.U. was offensive, unwarranted, and harmful.

135.    The MPD officers' offensive, excessive and outrageous conduct as described herein was done to intentionally harm or offend Plaintiff without his consent.

136.    The MPD officers' physical contact with Plaintiff as described herein, caused him to sustain internal and external injuries.

137.    The MPD officers are liable for their actions and wrongful conduct against Plaintiff as described herein absent a valid or lawful basis to engage in said conduct.

138.    Plaintiff was injured and offended as a direct and proximate result of the MPD officers' harmful and/or offensive bodily contact against him.

139.    Plaintiff's Damages—as defined in ¶ 111—were proximately and solely caused by the battery Defendant MPD officers committed against him without any negligence or assumption of the risk by Plaintiff.

140.    The District of Columbia is jointly and severally liable under the doctrine of *respondeat superior* for the aforementioned acts and omissions of the MPD officers.

## Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and court costs pursuant to all applicable state and federal authority, and any other relief the Court deems proper.

## COUNT VII
### (False Arrest – Against Defendants District of Columbia, Anderson, Blasting, and John/Jane Does 1-5)

141.    The allegations contained in the prior paragraphs are incorporated into Count VII as if fully set forth herein.

142.    Plaintiff did not engage in any unlawful or illegal conduct during the aforementioned April 14, 2020, incident.

143.    At the time the MPD officers initiated contact with Plaintiff and physically harmed him, he had not engaged in any conduct to provoke or warrant the wrongful conduct as described herein.

144.    The unlawful and wrongful actions, restraint and detention the MPD officers perpetrated against Plaintiff as described herein were committed against his will.

145.    At all relevant times herein, the MPD officers did not have any justifiable reason to forcefully restrain or detain Plaintiff for any period of time.

146.    Plaintiff suffered Damages—as defined in ¶ 111—as a direct result of the MPD officers' actions as described herein.

147.    Defendant officers Anderson and Blasting are directly liable for the false arrest they committed against Plaintiff.

148.    The District of Columbia is jointly and severally liable under the doctrine of *respondeat superior* for the aforementioned acts and omissions of Defendant MPD officers.

## Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and court costs pursuant to all applicable state and federal authority, and any other relief the Court deems proper.

## COUNT VIII
### (False Imprisonment – Against all Defendants)

149.    The allegations contained in the prior paragraphs are incorporated into Count VIII as if fully set forth herein.

150.    On October 10, 2018, December 12, 2018, July 5, 2019, April 14, 2020 and May 9, 2020, among possibly other dates that may be determined in discovery, MPD Officers initiated

contact with Plaintiff even though he had neither committed a criminal offense nor was about to commit a criminal offense, nor was there reason to believe he had committed or was about to commit a criminal offense.

151.    On each of those dates, MPD officers unlawfully restrained and detained Plaintiff for an unreasonable period of time even though they knew or should have known that Plaintiff had neither committed a criminal offense nor was about to commit a criminal offense.

152.    On each of said dates, the MPD officers unlawfully restrained and detained Plaintiff against his will.  On not a single of said dates did am MPD officer charge Plaintiff with any criminal offense as a result of the incident which forms the basis for this action.  On each of said dates, MPD officers unlawfully restrained and detained Plaintiff absent any cause to believe or belief that he had engaged in any unlawful conduct.

153.    The MPD officers are directly liable for falsely imprisoning Plaintiff.

154.    Plaintiff suffered Damages—as defined in ¶ 111—as a direct result of the MPD officers' actions as described herein.

155.    The District of Columbia is jointly and severally liable under the doctrine of *respondeat superior* for the aforementioned acts and omissions of Defendant MPD officers.

## Prayer for Relief

Wherefore, Plaintiff requests declaratory relief, injunctive relief, compensatory damages, punitive damages, an award of pre-judgment interest, an award of attorney's fees, expert fees, and court costs pursuant to all applicable state and federal authority, and any other relief the Court deems proper.


DAQUAN T. LEWIS

*/s/ K. Craig Welkener*
K. Craig Welkener, Esq. (DCB: 1033585)
Timothy P. Bosson, Esq. (DCB: 1029002)
Robert G. Rose, Esq. (DCB: 1029004)
Bosson Legal Group, PC
8300 Arlington Blvd., Ste. B2
Fairfax, Virginia 22031
tbosson@bossonlaw.com
Phone (571) 775-2529
Fax (571) 775-2521
*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiff requests a trial by jury on all claims made herein for which a jury is permissible.

_____*/s/*_____
K. Craig Welkener