## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAQUAN T. LEWIS,

*Plaintiff,*

v.

THE DISTRICT OF COLUMBIA, *et al.*

*Defendants.*

Case No. 20-cv-02241 (ABJ)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

This lawsuit seeks to end the Metropolitan Police Department's (MPD) unconstitutional practice of targeting Daquan Lewis, an African-American man who happens to hold a concealed carry license, for relentless stops, searches, and seizures.  That practice has recently escalated, even as this lawsuit proceeds.  Two days after briefing for the Motion to Dismiss concluded, on December 5, 2020, an MPD officer illegally stopped, groped, and handcuffed Mr. Lewis simply for declining to say whether he was carrying a gun.  Officers let Mr. Lewis free only after discovering he was unarmed.  When Mr. Lewis asked why he had been stopped, the officers simply reiterated that they were trying to figure out if he had a gun.

MPD's history with Mr. Lewis conclusively demonstrates a pattern of Fourth and Second Amendment violations.  MPD officers consider Mr. Lewis's possession of a concealed carry license and legal firearms to be an independent basis for reasonable suspicion, and even probable cause.  Mr. Lewis is no longer safe to exercise his Second Amendment right to carry a firearm on public streets.  He is emotionally scarred, and reasonably fearful.  The fear is objectively reasonable, because MPD has repeatedly acted on its belief that Mr. Lewis's legal gun possession

1

is grounds for stops and searches.  To protect his life, and his constitutional rights, Mr. Lewis asks

the Court to enter a targeted injunction as stated in the Proposed Order, requiring that (1)

Defendants not stop him without reasonable suspicion of a crime, and (2) all relevant officers be

informed that possessing a concealed carry license while being African-American **does not**

constitute reasonable suspicion.

## STATEMENT OF FACTS

### A.  December 5, 2020 Incident

In broad daylight on December 5, 2020, Mr. Lewis began walking home from a friend's

home close to 21st and Maryland NE, Washington DC.  Lewis Aff. ¶¶ 19-38.  There had been no

criminal activity in the area to Mr. Lewis's knowledge, and the police were not responding to any

immediate crime.  *Id*. ¶ 20.  As he walked along the sidewalk, an unmarked police car pulled up

behind him and an MPD officer jumped out.  *Id.*¶ 19  The officer followed Mr. Lewis and called

out "do you have a gun on you?"  *Id.*¶ 21.  Mr. Lewis kept walking.  *Id.*¶ 22.  When the officer

continued to repeatedly ask the same question, Mr. Lewis said "I don't want to talk to the police

right now.  I don't have to talk to the police."  *Id.*¶ 22.  The officer insisted that he had to talk if

had a gun on him.  *Id.*¶ 23.  Mr. Lewis responded essentially "no, I don't," understanding that

"unless the officer has started an investigatory stop, I do not have to speak to MPD."  *Id.*¶ 24.  The

officer said, "do you have it or not?"  *Id.*¶ 25; Pl. Ex. 12 (video of the encounter beginning at this

point).  When Mr. Lewis reiterated that he did not have to answer, the officer said "all right, we're

gonna stop right now.  We're gonna stop," while stepping in front of Mr. Lewis's path and

gesturing for him to stop.  Lewis Aff. ¶¶ 25-26; Ex. 12.

At this point, other officers began gathering.  The first officer held Mr. Lewis's wrist, and

reached for him with the other hand.  Mr. Lewis said "No.  I don't consent to no search."  Lewis

Aff. ¶¶ 27-28; Ex. 12.  But the officer just said "I'm telling you," placed a hand briefly on Mr.

Lewis' jacket, then reached for Mr. Lewis's groin region, without patting down his hip, back, or

pocket.  *Id.*  As the officer's hand touched Mr. Lewis' genitals over his clothing, Mr. Lewis

instinctively recoiled and yelled "why are you in my [inaudible] man?!?"[1] Lewis Aff. ¶ 30; Ex.

12.  But the officer continued probing Mr. Lewis's groin region, touching his genitals repeatedly,

including reaching inside of Mr. Lewis's pants.  Lewis Aff. ¶¶ 29-33; Ex. 12.  Mr. Lewis was

incensed, incredulous, and violated.  *Id.*

As officers surrounded Mr. Lewis, they forced him to take his hands out of his pockets and

wrenched his arms backwards painfully.  Lewis Aff. ¶¶ 31-33; Ex. 12.  They handcuffed him and

searched him for weapons.  *Id.*  Although the sexually inappropriate search was terrible, what

happened next was more dangerous.  A female officer exclaimed "There's a gun in your pocket,

there's a gun in your pocket."  Lewis Aff. ¶ 35; Ex. 12.  Mr. Lewis immediately responded – fearful

for his life - "I don't got no gun in my pocket."  Lewis Aff. ¶ 36; Ex. 12.  After officers verified

that he was telling the truth, they took his ID and left him to stand on the sidewalk.  Lewis Aff. ¶

38; Ex. 12.  When he received his ID back, Mr. Lewis left.

This unconstitutional stop and humiliating search was both the latest installment and the

last straw.

### B.  Prior Seven Events, As Alleged in the Complaint

As the Complaint recounts in detail, and pursuant to Mr. Lewis's affidavit verifying the

---

[1] Mr. Lewis's reaction here was similar to Mr. M.B. Cottingham's reaction in a similarly
sexually inappropriate search.  *See* Settlement Reached With D.C. Police After 'Inappropriate
Touching' During Stop-And-Frisk, WAMU, available at
https://wamu.org/story/18/12/06/settlement-reached-with-d-c-police-after-inappropriate-
touching-during-stop-and-frisk/ (last visited December 12, 2020); *see also* Video of the
Cottingham search at https://www.youtube.com/watch?v=zXILS80IyyU (last visited December
12, 2020).

Complaint, Lewis Aff. ¶¶ 4-5, Defendants have been targeting Mr. Lewis for years now. Mr. Lewis is a lifelong resident of Washington, D.C., and he lives near the Carver-Langston neighborhood in Northeast D.C. Compl. ¶ 28. He does not have, and has never had, any criminal cases or convictions on his record. *Id.* ¶ 30. In fact, he is an uplifting member of the community, and has volunteered in a leadership role with a youth mentoring nonprofit. *Id.* He is in his mid-20s, and an African American. *Id.* ¶ 1. But in 2018, he obtained a D.C. Concealed Carry Pistol License and a firearm registered with the District for personal safety, and apparently painted a police target on his back.

On **October 10, 2018**, Mr. Lewis was outside of an apartment building in the Carver-Langston neighborhood, talking with other young African American friends. Compl. ¶¶ 36-37; Ex. 1 (Police Video of October 10, 2018. A large group of uniformed, armed MPD officers quickly walked up to the group from several directions, "surrounding Plaintiff and asking him and all of the African American men if they had firearms." *Id.* ¶ 37; Ex. 1. Defendants Megan Mulrooney and Joseph Blasting were in the group of MPD officers. *Id.* ¶ 36. District law requires a concealed carry licensee, when subjected to an investigative stop, to inform officers that he or she is carrying a concealed pistol, and "[p]resent the license and registration certificate." D.C. Code § 7-2509.04. Surrounded on all sides by uniformed officers, all demanding to know if Mr. Lewis or his friends had a gun, Compl. ¶¶ 37-39, Mr. Lewis complied with his duty, informed the officers that he had a concealed pistol, and presented his paperwork. *Id.* ¶ 40. Although Defendants assert otherwise, Plaintiff's pistol was "secured in a holster in a part of compression shorts he was wearing underneath his pants." Compl. ¶ 40; Ex. 11 (Video of Mr. Lewis demonstrating exactly how he carried the weapon on 10/10/2018). Officers "initially wanted to retrieve the firearm by reaching into [Mr. Lewis's] pants, but Plaintiff protested and was allowed to remove the gun from its holster

4

and push the handle above his waistband, where an officer retrieved it, and confirmed that the firearm was in fact registered to Plaintiff." *Id.* ¶ 41.

Officers apparently gained the false impression that Plaintiff was not carrying the gun in a holster, although they never asked. *Id*. ¶ 42; Ex. 1.  On **October 22, 2018**, the MPD issued a Notice of Revocation that was explicitly "based on the October 10th incident." *Id*. ¶ 43; Ex. 3. MPD forced Mr. Lewis to turn in his concealed carry license, based on this Notice, and he compliantly did so.  *Id.*  Thus, Mr. Lewis was deprived of his concealed carry rights until he appealed the revocation, obtained counsel, and learned that a revocation "will take effect unless the licensee requests an appeal."  24 DCMR § 2341.3(b) (emphasis added); *see also* DCMR § 2341.3(b) ("Unless a licensee has requested an appeal pursuant to § 2341.6(b), a licensee whose concealed carry license is revoked shall return the license.").  Counsel for Mr. Lewis contacted MPD and confronted them with the violation.   After several weeks, MPD eventually returned the license.

On or around **December 12, 2018**, while Mr. Lewis's appeal remained pending, there was a drive-by shooting at a group of individuals gathered at an intersection in the Carver Langston neighborhood.  Compl. ¶ 48; Ex. 4.  MPD officers were less than a block away.  "Upon information and belief the MPD officers had witnessed the shooting and saw the shooters escaping in a car." Compl. ¶ 48.  Even though Plaintiff was on foot, and "officers knew … Plaintiff could not have possibly been the shooter or otherwise involved in the incident—the officers stopped Plaintiff rather than pursue the shooter." *Id*.  They ordered Plaintiff to stop, asked him if he was carrying a firearm and whether his Concealed Carry License had been reinstated, and searched him in full view of the crowd gathering at the scene. *Id.* ¶ 49.  Plaintiff cooperated fully with the officers, and his gun was in a holster.  *Id.*  Other than being in an alleged high crime area, there was no other

reason to support a reasonable, particularized suspicion that he was committing a crime.  *Id.*

"At or around this time, the District began threatening Plaintiff with criminal charges for failure to carry his gun in a holster."  *Id.* ¶ 50.  Eventually, "Plaintiff … agreed to complete a Firearm Safety Training Course and voluntarily surrender his Concealed Carry License … for a period of six (6) months."  *Id.* ¶ 51.  In exchange, the District of Columbia Office of the Attorney General agreed not to bring charges, if Mr. Lewis complied with the above conditions and was not arrested or convicted on any firearm offenses.  *Id.* ¶ 52.  Mr. Lewis did comply with all conditions, and "the Metropolitan Police Chief rescinded the revocation of Plaintiff's concealed carry license, with prejudice."  *Id.* ¶¶ 54-55.

But during the pendency of the stay, MPD continued to harass Plaintiff.  "On **July 5, 2019**, MPD Officer Guzman walked up to Mr. Lewis, while Mr. Lewis was seated in his own parked car. Blocking the door so that Mr. Lewis could not open it, Officer Guzman—armed, in full uniform— asked Plaintiff if he was carrying his firearm."  *Id.* ¶ 58-59; Ex. 5 (Lewis July 2019 Letter to MPD). "Plaintiff advised the officer that he did not want to talk further, but the officer continued to stand beside his vehicle door and prevent him from leaving."  *Id.* ¶ 59.  "Officer Guzman … nonetheless continued demanding to know—at least four times—whether Plaintiff had a firearm, while Plaintiff remained unable to leave."  *Id*.

On July 15, 2019, Plaintiff—through counsel—tried to appeal directly to MPD for relief. Ex. 5.  He sent a letter addressed to MPD's 5th District Commander William Fitzgerald respectfully advising him of the continued stops, asking that his civil rights be honored, and requesting that his letter be circulated to the officers in the Fifth District.  Ex. 5; Compl. ¶ 61. Nobody responded.  Compl. ¶ 61.

On **April 14, 2020**, another unconscionable stop occurred.  MPD Officers Joshua Anderson

and Joseph Blasting, among several others, approached and investigated Plaintiff's vehicle, while Plaintiff was away from it. Ex. 6 (Video); Ex. 10. When Mr. Lewis arrived, the officers immediately walked towards him, put Mr. Lewis' hands behind his back, and simultaneously asked whether he had his pistol. Ex. 6; Compl. . In fact, "Plaintiff's firearm was secured in a holster inside of a fully-zipped side pocket in his jacket and completely hidden from view." Compl. ¶ 63; Lewis Aff. ¶ 12. "[D]espite Plaintiff's full cooperation with the officers, the MPD officers nonetheless arrested Plaintiff, cuffed him, and confiscated his firearm, ammunition, holster, Concealed Carry License, registration certificate, and wallet." *Id.* ¶ 63. Mr. Lewis was incensed, humiliated, and confused. *Id.* ¶ 84. When Mr. Lewis sought the return of his property, "MPD returned the wallet … but refused to discuss returning the remaining items." *Id.* ¶ 64.

For months, MPD refused to communicate with Mr. Lewis at all, as he sought return of his Concealed Carry License, registration certificate, firearm, ammunition, holster. Compl. ¶ 64.

In fact, MPD specifically targeted Mr. Lewis again during this period. "On . . . **May 9, 2020**, MPD officers approached and began to peer through the windows of Plaintiff's vehicle, which at the time was parked lawfully on a street not far from his residence. *Id.* ¶ 65. Nothing potentially illegal or suspicious was within open view to the officers. The officers then summoned a canine unit to inspect Plaintiff's vehicle." *Id.* ¶ 65. When Plaintiff approached, "the officers threatened to break into Plaintiff's car if Plaintiff did not grant them access to it." *Id.* ¶ 66. "[O]fficers claimed that the police dog had indicated that the smell of firearms was emanating from the vehicle. Plaintiff possessed a valid SPO license and registered firearm—not to mention a valid concealed carry license and corresponding registered firearm, all of which were legal— rendering the smell of firearms no evidence of crime at all." *Id.* ¶ 67 (emphasis removed). "Only to prevent the officers from breaking into his vehicle, Plaintiff opened up the vehicle, and thereafter

the officers began to perform a search," finding nothing illegal.  *Id.* ¶ 68.

Again, Mr. Lewis appealed directly to the MPD to end this overly intrusive conduct. Ex. 10.  On June 5, 2020, the undersigned counsel sent a letter detailing Defendants' unconstitutional conduct and requesting Plaintiff's property be returned, among other things.  *Id.* Again, nobody responded.  Compl. ¶¶ 69-70.

On July 27, 2020, over three months after illegally confiscating Plaintiff's gun, holster, concealed carry license and registration card—and following a *third* demand letter seeking such items—the MPD finally offered to return them.  Mr. Lewis successfully retrieved his belongings a few days later.  *Id.* ¶ 70.  The MPD never offered any explanation for this behavior.

### C.  Impact on Mr. Lewis' Second Amendment Rights

After MPD reluctantly returned Mr. Lewis's concealed carry license and firearm, Mr. Lewis's exercise of his Second Amendment rights dramatically decreased.  He estimates that between the license return on approximately August 1st and December 5, 2020, he only carried his concealed firearm a total of four times: approximately once per month.  Lewis Aff. ¶¶ 16-18.

But since the December 5, 2020 event, Mr. Lewis has been severely shaken.  *Id.* ¶¶ 37-40.  He has had difficulty sleeping, and spends evenings thinking over his police encounters, and trying to calm down.  *Id.*  In this past week, Mr. Lewis visited a medical provider, and obtained a prescription medication simply to allow himself to sleep.  *Id.*; Ex. 14.  Defendants' actions have made it untenable for Mr. Lewis to exercise his concealed carry license, absent court protection. Lewis Aff. ¶ 41.  As his affidavit recounts, Mr. Lewis is afraid that carrying his legal, registered concealed pistol makes him a target for dangerous police stops, that police are looking for any reason at all to take his concealed carry license, and police are targeting Mr. Lewis because he is Black, and exercising Second Amendment rights in a high-crime neighborhood.  *Id.* ¶¶ 39-45.

All of this may sound sterile on paper.  But this is Mr. Lewis' life.  When an officer exclaimed "There's a gun in your pocket, there's a gun in your pocket," his life hung in the balance. Lewis Aff. ¶ 39 ("I have difficulty sleeping at night because I play over in my head these interactions with the police and how they could easily result in me being shot like so many other black men.").  Long-time friends fear for Mr. Lewis's safety, and observe the impact of repeated constitutional violations on him.  Bolden Aff. ¶¶ 6-8 ("It is painful to see the impact this experience with D.C. police officers is having on Daquan.  He is often depressed, discouraged and afraid of encountering police officers, and choose to stay here at "859."  His fear surfaces constantly in our conversations and consistently make him second guess himself and his ability to be a Special Police Officer."); Spriggs Aff. ¶¶ 8-10 ("I can hear in his voice how nervous and upset he was each time").  The fear is objectively reasonable, not just in the year of George Floyd and Ahmaud Arbery and many others, but since MPD has repeatedly acted on its belief that Mr. Lewis's legal gun possession is grounds for stops and searches.  *E.g.* Lewis Aff. ¶¶ 43-44.  Now, MPD's campaign has succeeded in forcing Mr. Lewis to stop exercising his Second Amendment rights. *Id.* at 41-45.  His firearm remains locked away out of fear.  *Id.*

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also Gordon v. Holder*, 721 F.3d 638, 644 (D.C. Cir. 2013) (same).

**ARGUMENT**

I.    **Mr. Lewis Has a Substantial Likelihood of Prevailing on the Merits**

    A.   **Defendants Repeatedly Violate Mr. Lewis's Fourth Amendment Rights**

The Fourth Amendment is supposed to be a bulwark to protect everyday dignity. *Fisher v. City of Las Cruces*, 584 F.3d 888, 897-98 (10th Cir. 2009) (citation omitted) ("Interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests—a person's sense of security and individual dignity.").

Under the Fourth Amendment, a "seizure occurs 'when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (citations omitted). "A show of authority sufficient to constitute a seizure occurs where 'the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted). If 'a reasonable person would have believed that he was not free to leave,' a seizure has occurred for constitutional purposes. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In making that determination, courts consider the totality of the circumstances, including 'whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled.' *Delaney*, 955 F.3d at 1081 (quoting United States v. Castle, 825 F.3d 625, 632-33 (D.C. Cir. 2016) (internal quotation marks and alterations omitted)).

"An investigatory stop must be justified by some objective manifestation that the person

stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981).  A "demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*" *United States v. Cortez*, 449 U.S. 411, 418 (1981) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968)) (emphasis in *Cortez*). It is not enough for police to know only that "criminal activity was afoot broadly," but have no "suspicion that the particular individual being stopped—that is, [Plaintiff]—was engaged [at that moment] in [the] wrongdoing." *Delaney*, 955 F.3d at 1087 (citations and internal marks omitted).

In the District of Columbia, it is legal to carry a handgun in compliance with the City's regulations (see, *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014); *Heller v. District of Columbia* [*Heller III*], 801 F.3d 264 (D.C. Cir. 2015)); and it is certainly legal to possess a concealed carry license. *Wrenn v. District of Columbia*, 864 F.3d 650, 655 (D.C. Cir. 2017).

Here, Defendants have repeatedly violated Mr. Lewis's Fourth Amendment rights.

On October 10, 2018, MPD officers surrounded Mr. Lewis, demanding to know if he had a gun, but lacking any particularized suspicion.  A "'show of authority' sufficient to effectuate a stop" occurs where officers' positioning creates "restrict[ions on] . . . movement," *United States v. Delaney*, 955 F.3d 1077, 1083 (D.C. Cir. 2020) (citations omitted), where officers ask "targeted" questions, *see id.* at 1084, and especially when officers surround an individual.  *State v. Edmonds*, 145 A.3d 861, 873 (Conn. 2016) (collecting cases).  The show of force is heightened here, where the citizen is under additional statutory duties to disclose his licensee status.  D.C. Code § 7-2509.04(d).  This was an unconstitutional stop.

On December 12, 2018, a <u>drive-by</u> shooting occurred, but MPD officers decided to stop Mr. Lewis as he <u>walked</u> down the sidewalk.  Compl. ¶ ; Ex. 4.  Before initiating the stop,[2] the

---

[2] There is no question whether this was a stop.  The officer told Mr. Lewis "you have to tell me if you have it [the gun] on you."

officers' conversation in the car makes clear that they have no suspicion of Mr. Lewis' involvement in the shooting. Ex. 4. They decided to stop and search him—even though they though he would not "talk[3]"—simply because they knew he had a "permit," and wondered if his gun was in a "holster." Ex. 4. The Fourth Amendment does not allow residual or free-standing reasonable suspicion, based on general impressions of a person. *United States v. Cortez*, 449 U.S. 411, 418 (1981) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 n.18 (1968)) (in fact, "demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*") (emphasis in *Cortez*). A stop is not justified when police know only that "criminal activity was afoot broadly," but have no "suspicion that the particular individual being stopped—that is, [Plaintiff]—was engaged [at that moment] in [the] wrongdoing." *Delaney*, 955 F.3d at 1087 (citations and internal marks omitted). This stop clearly lacked reasonable suspicion.

A similar suspicion-free stop occurred on July 5, 2019. Blocking the door so that Mr. Lewis could not open it, Officer Guzman—armed, in full uniform—asked Plaintiff repeatedly if he was carrying his firearm. Compl. ¶ 58-59; Ex. 5. This was a stop, because the officer repeatedly and authoritatively demanded an answer, and his body position left Mr. Lewis literally not free to leave. *Id. See Castle*, 825 F.3d at 623-633 (courts consider "whether the officer … restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.")

On April 14, 2020, Defendants again stopped and subsequently arrested Mr. Lewis simply

---

[3] The officers' reference to Mr. Lewis talking—i.e. telling them about suspects for the recent drive-by shooting—reaffirms the general theme of the conversation: no suspicion of actual involvement in the shooting, just curiosity about his gun law compliance.

for having his concealed carry pistol.  Ex. 6.  Defendants did not have reasonable suspicion to *stop* Mr. Lewis in the first place, since he was doing nothing illegal, and his "firearm was secured in a holster inside of a fully-zipped side pocket in his jacket and completely hidden from view." Compl. ¶ 63; Lewis Aff. ¶¶ 8-15.  Although Defendants claim that they had probable cause for the arrest, Mr. Lewis was carrying his pistol exactly as the regulations require:  "in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol." 24 DCMR § 2344.2; Lewis Aff. ¶¶ 9-13; Compl. ¶¶ 63, 102-10.

On May 9, 2020, Defendants committed one of the most egregious Fourth Amendment violations, when they forced Mr. Lewis to open his car for a search on threat of breaking into it by force.  Compl. ¶ 65-68; Lewis Aff. ¶¶ 4-5.  The only justification police proffered for the threat was a police dog alerting to the smell of firearms.  *Id.*  But "the police [do] not have reasonable suspicion," much less probable cause for a search, merely because they suspect "gun possession, which is lawful."  *See United States v. Watson*, 900 F.3d 892, 893 (7th Cir. 2018).

And just a few days ago, December 5, 2020, Defendants again stopped and searched Mr. Lewis without reasonable suspicion, as recounted above.

Courts in this district and beyond have repeatedly enforced the constitutional minimum of reasonable suspicion through preliminary injunctions.  *Bangert v. Hodel*, 705 F. Supp. 643, 656 (1989) (enjoining suspicion-free, mandatory urinalyses of agency employees); *Nat'l Treasury Emps. Union v. Watkins*, 722 F. Supp. 766, 771 (1989) (same).  And in a factually parallel case, the Southern District of New York enjoined the New York Police Department's practice of "performing trespass stops outside [certain] buildings in the Bronx without reasonable suspicion of trespass, in accordance with the law as set forth and clarified in this Opinion."  *Ligon v. City of New York*, 925 F. Supp. 2d 478, 542 (S.D.N.Y. February 14, 2013).   The Court explained that

"Encounters involving nothing more than commands or accusatory questioning can and routinely do rise to the level of *Terry* stops, provided that the commands and questioning would lead a reasonable person to conclude he was not free to terminate the encounter." *Id*. at 542-43. The Court cautioned police that "an individual observed exiting or entering and exiting a TAP building does not establish reasonable suspicion of trespass, even if the building is located in a high crime area, and regardless of the time of day." *Id.* at 543.

Just as in *Ligon, Bangert* and *Nat'l Treasury Emps. Union*, Defendants make a practice of stopping Mr. Lewis without reasonable suspicion. Simply because he has a concealed carry license, or is African American, or is "located in a high crime area," simply does not create reasonable suspicion. *Id*. And just as in those cases, Mr. Lewis has shown a substantial likelihood of success on the Fourth Amendment merits.

**B. Defendants Repeatedly Violate Mr. Lewis's Second Amendment Rights**

Perhaps the most easily resolved constitutional question in this case is under the Second Amendment. "[T]he individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections." *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (2017). As pled and proven here, the Defendants consistently use Mr. Lewis's exercise of rights clearly established by *Wrenn, Palmer*, the *Heller cases and* others as *evidence of criminality*. In other words, they target his constitutional exercise with street-level law enforcement.

On December 12, 2018, Defendants stopped Mr. Lewis because he had a "permit"—referencing his concealed carry license—just to see whether his gun was holstered. On May 9, 2020, Defendants literally threatened to break into Mr. Lewis's car because it smelled of

firearms.  On December 5, 2020, Defendants stopped Mr. Lewis simply because he declined to talk to police about whether he was carrying.

The D.C. Circuit's decision in *Wrenn* established a Second Amendment right to concealed carry licenses, *Wrenn*, 864 F.3d at 667, and many other cases establish a Second Amendment right to gun ownership and possession in the District of Columbia.[4]  To treat the exercise of these rights as independent justifications for stops and searches violates the Second Amendment, punishing the exercise of protected rights.

## II.    Mr. Lewis Is Suffering and Will Continue to Suffer Irreparable Harm in the Absence of Relief

The Supreme Court "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22.  "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see also Gordon v. Holder*, 721 F.3d 638, 653 (2013) ("suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.") (citation omitted).

Here, Mr. Lewis's injury is not simply threatened, or "likely"—it is actual and ongoing.  Given MPD's established position that a particularized suspicion of active criminal conduct is not required—and the danger a Black man faces in a police stop—Mr. Lewis cannot safely exercise his Second Amendment rights.  Lewis Aff. ¶¶ 35-36; Ex. He is now forced to leave his concealed carry pistol at home.  That is an active, ongoing constitutional injury.  "The violation

---

[4] *See, e.g. Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014); *Heller v. District of Columbia* [*Heller III*], 801 F.3d 264 (D.C. Cir. 2015)).

of such a personal constitutional right is per se irreparable." *Advance Am. Cash Advance Ctrs., Inc. v. FDIC*, Civil Action No. 14-953 (GK), 2017 U.S. Dist. LEXIS 27887, at *27 (D.D.C. 2017). And because the injury is ongoing, it is "both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (2006). Without injunctive relief, Mr. Lewis will not be able to safely exercise his Second Amendment rights.

Another reason supporting Mr. Lewis's likelihood of irreparable harm is the systemic nature of Defendants' Fourth Amendment practices.

When considering MPD's practices as a whole, stop and frisks are extremely frequent, and focus disproportionately on Black people. Just last year, D.C. Superior Court granted a preliminary injunction requiring MPD to comply with the data collection requirements of the Neighborhood Engagement Achieves Results Act (NEAR Act). Ex. 9. That law required MPD to collect data on stop-and-frisk practices, including data on the reason for the stop, the race of the target, the result of the stop, and the location thereof. *Id.* at 1-2. The NEAR Act went into effect in June 2016, and MPD had failed to start collecting the data as of three years later, in June 2019. *Id.* Once MPD began collecting data in July 2019, the results were revealing. *See* Ex. 8 (ACLU Report on Racial Disparities in MPD Stops – Review of Five Months of Data).

In a mere five months of data collection, "62,611 total stops" occurred in the District. Ex. 8 at 2. That "number . . . works out to, on average, one stop every 3 minutes and 45 seconds." *Id.* Only .8% of stops resulted in the seizure of a weapon. *Id.* at 1. "Black people, who make up 46.5% of the D.C. population, composed 72% of the people stopped." *Id.* Even worse, Black people made up "86.1% of the stops, and 91.1% of the searches that resulted in no

warning, ticket, or arrest" indicating "that MPD's stop practices unfairly overpolice the Black community." *Id.* at 1-2.  Disparities are particularly stark in non-traffic stops, where identification of race is easier.  *Id.* at 5-6.  In the Fifth District, where Mr. Lewis lives, Lewis Aff.  90.3% of non-traffic stops were of Black people, although Black people are only 65.4% of the population.  White people are 23.5% of the population, but make up a miniscule 3.5% of non-traffic stops.  *Id*.  The list of race disparities goes on and on.  *Id.* at 7-10.

What is more, MPD's practices related to gun recovery have Fourth Amendment implications in this case.  A line of D.C. Circuit cases upholds a jump-out-and-ask-about-guns methodology as not constituting a "stop" for Fourth Amendment purposes.  *United States v. Gross*, 784 F.3d 784 (2015); *United States v. Goddard*, 491 F.3d 469 (2007).  Somewhat similar facts have repeatedly played out in Mr. Lewis's case, but with a key wrinkle.  Here, the fact Mr. Lewis is a concealed carry holder and owner of a registered firearm transforms the encounter in MPD's mind.  Ex. 4 at 4:29-39 (officer refusing Mr. Lewis's attempt to walk away, asking authoritatively "do you have your gun on you?!?" and causing Mr. Lewis to stop.  Officer then says: "you have to tell me if you have it on you.").  Repeatedly, officers have explicitly said to Mr. Lewis that he *must* answer their questions.  This happened in December 2018, *id*. and it happened again in December 2020.  Ex. 12 (Officer says "do you have it or not?" When Mr. Lewis refused, he said "ok we're gonna stop.").  On both occasions, Defendants had no reasonable suspicion, but clearly stopped Mr. Lewis.  That MPD believes and communicates that Mr. Lewis *must* answer their questions is very significant, both factually and legally.  Because Mr. Lewis was not allowed to leave, "coercion [] cease[d] to masquerade as consent."  *See Gross*, 784 F.3d at 791 (2015) (J. Brown, concurring).

The mandatory nature of these encounters is heightened by certain ambiguity in District

law.  Under D.C. Code § 7-2502.08, which states that "Each registrant shall have in the registrant's possession, whenever in possession of a firearm, the registration certificate, or exact photocopy thereof, for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.   By contrast, D.C. Code § 7-2509.04(d) only requires a concealed carry holder to disclose their concealed pistol only "If a law enforcement officer initiates an investigative stop of a licensee carrying a concealed pistol."[5] This contrast may be what is leading MPD to wrongly believe that Mr. Lewis must answer questions.  Under these duties, in October 2018 and April 2020, Mr. Lewis was compelled to disclose his own weapon by the officers' investigatory stop, and the requirements of D.C. Code § 7-2509.04(d).  In "the totality of the circumstances," *Gross*, 784 F.3d at 788, the existence of these statutory duties, real or perceived, transforms these encounters into suspicion-free stops rather than consensual encounters.

Given MPD's expressed belief and regular practice—especially in Mr. Lewis's neighborhood—Defendants are likely to repeatedly cause Mr. Lewis irreparable constitutional injury.

## III.    The Equities Favor Mr. Lewis

The equities clearly favor Mr. Lewis here.  As detailed above, Mr. Lewis has been subject to numerous suspicion-free stops and searches, the most recent of which subjected Mr. Lewis to an invasive groin search, simply because of his desire not to speak with police.  Lewis

---

[5] The only constitutional way to interpret D.C. Code § 7-2502.08 would be to hold that MPD may "demand" registration documents during a stop supported by reasonable suspicion (or more). *Rust v. Sullivan*, 500 U.S. 173, 190 (1991) ("as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.") If MPD is allowed to "demand" registration documents without initiating an investigative stop, the law would empower MPD to conduct *Terry* stops without reasonable suspicion.

Affidavit ¶¶ 19-38.  Mr. Lewis has Second Amendment rights to concealed carry; because of MPD's treatment, he is unable to safely exercise those rights.  *Id*. ¶ 39-45.

The equities are further bolstered by Mr. Lewis's sustained attempts to make MPD management aware of the harassment he was facing, and seek reconciliation outside of court. Mr. Lewis wrote to the Fifth District Commander, informing him of the illegal stops in a conciliatory manner, and asking for peace-making reconciliatory steps that MPD simply ignored. Despite ongoing harassment, he did this in July 2019, Ex. 5, and again in June 2020.  Ex. 10. MPD eventually gave the seized license back.  Compl. ¶ 70.  But none of the Defendants have ever taken any steps to prevent these ongoing wrongs.  *Id.* ¶ 71.

On the other side, MPD has a generalized interest in enforcing the law, including gun laws, and protecting public safety.  *See Wrenn*, 864 F.3d at 667 ("The District has understandably sought to fight this scourge [gun violence] with every legal tool at its disposal.") These interests are certainly important.  *Id.*  However, those interests are extremely attenuated as to Mr. Lewis himself, given Mr. Lewis's excellent character, law-abiding record, exercise of the very right upheld in *Wrenn,* and demonstrated commitment to public safety as a Special Police Officer and private citizen.  Spriggs Aff.  ¶¶ 3, 6-7, 11; Bolden Aff. ¶ 4.  As the affidavits of Vincent Spriggs and Rickey Bolden demonstrate, Mr. Lewis is a force for good.  Bolden Aff. ¶ 4 ("Throughout my relationship with Daquan, he has consistently proven to be a man of character and integrity.  He has consistently proven to be trustworthy to the point that I have entrusted to him keys to our ministry house.  He is responsible and well respected in our community.  He is a great brother and friend."); Spriggs Aff. ¶¶ 3, 6-7, 11 ("I am a retired detective with the Metropolitan Police Department.  I am also Daquan Lewis' grandfather.  Daquan has always been law abiding, trustworthy and very level headed. He has never lied to me and I find him to

be honest.  Daquan was raised to respect the law in which he has done, to include choosing to

serve and protect which is very honorable.").

Overall, the equities must be evaluated in light of the narrow, tailored injunction that

Plaintiff seeks.  *See* Proposed Order.  Mr. Lewis's injuries are repeated, ongoing, and irreparable.

MPD's interest in law enforcement and public safety certainly does not extend to stopping Mr.

Lewis without reasonable suspicion.  *Delaney*, 955 F.3d at 1087.  And the complex equities

involved in policing low-income African-American neighborhoods strongly favors police

adherence to minimum constitutional standards.

On the whole, the balance of the equities clearly favors Mr. Lewis.

## IV.    A Preliminary Injunction is in the Public Interest

"The primary purpose of a preliminary injunction is to preserve the object of the

controversy in its then existing condition—to preserve the status quo."  *Aamer v. Obama*, 742

F.3d 1023, 1043 (D.C. Cir. 2014).  Here, perhaps the central object of this controversy is the

intertwined exercise of Second Amendment and Fourth Amendment freedoms which Defendants

consistently deny to Mr. Lewis.  "[T]he individual right to carry common firearms beyond the

home for self-defense—even in densely populated areas, even for those lacking special self-

defense needs—falls within the core of the Second Amendment's protections."  *Wrenn v. District

of Columbia*, 864 F.3d 650, 661 (2017).   And "the interests protected by the Fourth Amendment

are not confined to the right to be secure against physical harm; they include liberty, property,

and privacy interests--a person's sense of security and individual dignity."  *Fisher v. City of Las

Cruces*, 584 F.3d 888, 897-98 (10th Cir. 2009) (citation omitted).

Without an injunction, Mr. Lewis cannot exercise his Second Amendment rights.  Lewis

Aff. ¶¶ 39-45.  Instead of his concealed carry license facilitating personal safety, it subjects him

to repeated, humiliating stops and searches on the streets of his own neighborhood.  *Id.*  It *increases* the danger that Mr. Lewis would die in a police-escalated encounter.  *Id.*  By simply ordering MPD to refrain from stopping Mr. Lewis absent reasonable suspicion, the Court would uphold the public's interest in maintaining constitutional values.

Perhaps even more importantly, the public at large has much to gain from MPD officers learning—loud and clear—that reasonable suspicion is always required for a stop, including for a Black concealed carry holder.  As the videos submitted in this case demonstrate—and as the data of MPD's stops and frisks bears out—tremendous racial tensions exist around police-community relations.  As it stands, Defendants conduct a stop and frisk every 3 minutes and 45 seconds, recovering a gun only a miniscule 0.8% of the time.  Ex. 8 at 1-2.  Clarifying to MPD and to the public that reasonable suspicion remains the baseline for investigative stops in the fraught environment of Mr. Lewis's Second Amendment exercise has great value, bolstering public trust in law enforcement and the justice system.

## CONCLUSION

For these reasons, Mr. Lewis asks the Court to enter a tailored preliminary injunction, requiring that Defendants refrain from stopping Mr. Lewis without reasonable suspicion, along with related relief as detailed in the Proposed Order.

Respectfully submitted,

**DAQUAN LEWIS**

*/s/ K. Craig Welkener*
K. Craig Welkener, Esq. #1033585
Timothy P. Bosson, Esq. #1029002
Robert Rose, Esq. #1029004
BOSSON LEGAL GROUP, PC
8300 Arlington Blvd., Ste. B2

Fairfax, VA  22031
Ph: (571) 775-2529
Fax: (571) 775-2521
tbosson@bossonlaw.com
cwelkener@bossonlaw.com
rrose@bossonlaw.com

*Counsel for Plaintiff*