UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DAQUAN T. LEWIS,**

                *Plaintiff,*

  v.

**THE DISTRICT OF COLUMBIA,** *et al.*

             *Defendants.*

Case No. 20-cv-02241 (ABJ)

**REPLY IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

    Mr. Lewis wants to carry his licensed, concealed handgun for self-defense in the District, without being stopped and searched for doing so. The Second and Fourth Amendments guarantee no less. But Defendants disagree and have violated these rights at least six times. They believe that "even if [Mr. Lewis] were in fact barred from carrying a concealed firearm, this would in no way infringe on his Second Amendment rights . . .." Defs. Opp. to Pl. Appl. Pre. Inj. 10 (Opp.). They contend that reasonable suspicion for a stop is not always required. Officers routinely order Mr. Lewis to stop and answer whether he has a gun—suspecting only that he does—then search him afterwards. The latest evidence confirms this. And in court, they claim that it is not "clearly established" whether they may stop people simply "to see whether they are carrying a concealed firearm in compliance with applicable regulations." Opp. at 7.

    But reasonable suspicion <u>is</u> legally required. Defendants' beliefs and actions do not square with this essential requirement, and they endanger Mr. Lewis's life. Exercising his constitutional rights in this context is untenable. Mr. Lewis respectfully asks the Court to clarify and enforce the law, and grant a preliminary injunction.

1

**ARGUMENT**

After Defendants filed their Opposition, they provided hours of body camera footage regarding five key incidents to Mr. Lewis, along with police reports. As discussed below, the new evidence only confirms the allegations in the Complaint and Application for a Preliminary Injunction.[1] With that evidence in place,[2] there can now be no question that Mr. Lewis is likely to succeed on the merits. Given Defendants' routine, regularized approach to stopping and searching Mr. Lewis, a preliminary injunction is appropriate. This is especially true given the officers' view that they can force Mr. Lewis to tell them whether he has a gun, simply because they suspect he has one, and their attorneys' defense of this contention as not being clearly erroneous.

This Reply incorporates the Opposition to the Motion to Dismiss by reference. Where Defendants make new arguments, each fails.

**I.  Mr. Lewis Is Likely to Prevail on the Merits**

   **a.  The Second Amendment**

Defendants' central contention is that the Second Amendment does not apply to their conduct, because it permits them to restrict a citizen's right to use "a single firearm." Opp. 5. But that argument has no application where a license, not any particular gun, is at issue. Binding District case law establishes that firearm licenses are protected by the Second Amendment. *Wrenn*, 864 F.3d at 656 (finding a Second Amendment violation where "plaintiffs [were] denied a concealed-carry license"); *see also Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 176

---

[1] Defendants, tellingly, only submitted a single police report in support of their Opposition, and do not quibble with Plaintiff's view of the facts.

[2] Exhibits 14-18 in this brief refer to the Exhibits attached to Plaintiff's Consent Motion for Leave to File a Supplemental Affidavits and Exhibits Under Seal. ECF No. 19. Exhibits 1-13 were filed with the Application for a Preliminary Injunction.

(D.D.C. 2014); *Heller I*, 554 U.S. 570, 576 (2008).  All of the cases Defendants cite rely on gun seizures, not license seizures, or police stops due to the citizen having a license.  MPD has conceded that Mr. Lewis has a current, valid concealed carry license, and can therefore legally carry a firearm.  Opp. at 10.  Plaintiff possesses that license by virtue of the D.C. Circuit's decision in *Wrenn*, and Defendants have now twice confiscated that license itself.  Opp. to MTD 16-17.

Even when MPD is not physically seizing Mr. Lewis's license, officers target Mr. Lewis because of his exercise of concealed-carry rights—**not because of any particular firearm**.  On October 18, 2018, police stopped Mr. Lewis simply because he was known to have a concealed carry license, and they "wonder[ed]" if it was in a holster.  Ex. 4 (body cam video of officer discussion).  On May 9, 2020—while the license was still unlawfully in MPD's possession— officers targeted Mr. Lewis's car because he was "known to carry firearms," Ex. 18 (May 9, 2020 Police Report) at 2, and they speculated that his license must have been revoked.  Ex. 16 (May 9, 2020 body camera video) at 11:38-11:56.  On December 5, 2020—even after MPD had returned the still-valid license to Mr. Lewis—the Gun Recovery Unit stopped Mr. Lewis, because they "had [false[3]] prior knowledge that [Mr. Lewis] had a revoked license to carry a firearm."  Opp. Ex. A, ECF No. 16-1 at ECF pg. 4 of 9.  In other words, MPD is stopping Mr. Lewis because of his concealed carry license.  This affects his ability to carry at all and would not be remedied if Mr. Lewis purchased additional weapons, for example.  This implicates the Second Amendment.  *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (2017).

Defendants betray their disregard for Mr. Lewis's Second Amendment rights by failing to cite *Wrenn* even once.  They even assert that "if [Mr. Lewis were in fact barred from carrying a

---

[3] See p. 5 below.

concealed firearm, this would in no way infringe on his Second Amendment rights because he would not be barred from possessing firearms in other contexts." Opp. 10.  This directly contradicts *Wrenn's* central holding, "[a]t the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions," 864 F.3d at 667, and its mandate: a "total ban on exercises of that constitutional right for most D.C. residents [is] enough to sink this law under *Heller I*." *Id.*  And for the reasons that follow, the "longstanding restrictions" mentioned in *Wrenn* do not include police stops without reasonable suspicion.

### b.  The Fourth Amendment

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968).  The basic requirement of *Terry*—reasonable suspicion—is routinely ignored by Defendants in this case.

### On December 5, 2020, Police Lacked Reasonable Suspicion

Defendants try to defend this latest incident, but the available evidence[4] completely

---

[4] The officer who stopped Mr. Lewis apparently did not have his body camera turned on, as MPD did not provide footage from this officer, which would violate MPD regulations. *United States v. Gibson*, 366 F. Supp. 3d 14, 19 n.3 (D.D.C. 2018) ("It is undisputed that the MPD officers violated an MPD General Order by not activating their body-worn cameras upon coming into contact with Mr. Gibson.")   The best footage that does exist—and the later-created police report—are all consistent with Mr. Lewis's account.

This violation of MPD regulations independently supports an adverse inference against MPD, as District Judge Sullivan held in *Gibson*. *Gibson*, 366 F. Supp. 3d at 26-27 ("The Court need not infer that the MPD officers were intentionally not activating their body-worn cameras.  That said, the Court is troubled that all four officers failed to adhere to MPD policy, especially because the officers knew that not activating their cameras would prevent the conversation from being recorded.  Indeed, the very purpose of the "Body-Worn Camera Program," as set forth in General Order 302.13 is to 'promote public trust, and enhance service to the community by accurately

supports Mr. Lewis's affidavit: police stopped him for declining to answer questions about whether he had a gun. *Compare* Exhibit 14 at 1:55-2:17 with Lewis Affidavit at ¶¶ 19-26.  An officer began following Mr. Lewis as he walked on the street and asked whether Mr. Lewis had a gun. *Id.*  Mr. Lewis declined to talk, continued walking, and protested "no I don't" and "that's not a reason to stop me" when the officer insisted that he answer.  *Id.*  The officer then says "Ok, we're going to stop," steps in front of Mr. Lewis, and gestures for him to stop.  *Id.*  He then gropes Mr. Lewis's groin area, and officers aggressively search Mr. Lewis.  *Id.*; *see also* Ex. 12 (better view of the search).

Defendants imply that they had reasonable suspicion because "[t]he arresting officer . . . knew plaintiff previously had his CCL revoked." Opp. 6 (citing Opp. Ex. A[5]).  But Mr. Lewis did *not* have his CCL revoked on December 5, 2020, and in fact it has never been revoked.  MPD attempted to revoke Mr. Lewis's license in 2018, but Mr. Lewis appealed, and the parties settled, agreeing to "voluntary surrender" and suspension of Mr. Lewis's CCL for six months, from February to August 2019, in lieu of revocation.  Compl. ¶¶ 43-56; Lewis Aff. ¶¶ 4-5 (verifying complaint); Def. MTD Exhibit 3.  Defendants do not bother to explain why, almost a year and a half later, that suspension contributes to reasonable suspicion that Mr. Lewis was carrying

---

documenting events, actions, conditions, and statements during citizen encounters . . . and to help ensure officer and public safety.' By failing to adhere to MPD policy and activate their body-worn cameras, the MPD officers deprived the Court from reviewing the best evidence available.")  (citations omitted).

Mr. Lewis is particularly to be believed over the officer who stopped him, since that officer later told Mr. Lewis that he stopped Mr. Lewis because "you were doing too much."  Ex. 14 at 2:50-3:10.

[5] According to the police report, Mr. Lewis "was observed concealing his groin area," and the officer stopped him "[b]ased on his action and the prior knowledge."  Defendants do not bring that up, and appropriately so.  Concealed carry law requires Mr. Lewis to conceal a weapon if he carries one.

unlawfully.[6] The Fourth Amendment demands specific information indicating that "the particular individual stopped . . . was engaged in wrongdoing" at the time they are stopped, not 17 months earlier. *Delaney*, 955 F.3d at 1087; *United States v. Cortez*, 449 U.S. 411, 418 (1981). The fact that the Gun Recovery Unit is such on such old, incorrect information is strong evidence of the need for an injunction.

Defendants also imply that "walking away . . . and refusing to answer . . . questions" contributed to reasonable suspicion. But this squarely contradicts binding case law holding that citizens are free to do exactly that. In fact, the crux of the test for a seizure is whether "a reasonable person would have believed that he was not free to leave." *United States v. Goddard*, 491 F.3d 457, 460 (2007) (citing cases). If declining to speak to police is sufficient to create reasonable suspicion, then citizens will always have to stop and answer police questions—either when first questioned, or after declining to answer. That would upset the delicate balance established in *Terry*. *See United States v. Gross*, 784 F.3d 784, 791 (2015) (Brown, J., concurring:

> Persons questioned by the District's Gun Recovery Unit patrols may reasonably be at a loss as to how to react to these contacts. Is there a means to react to such nominally voluntary encounters that might preserve their constitutional prerogatives? I offer this advice: speak to officers firmly, politely, respectfully. Tell them, "I do not wish to have an encounter with the police right now. Am I free to leave?" If the answer is "no," then coercion will cease to masquerade as consent. Our courts will be forced, at last, to directly grapple with the reality of the District's policy of routinized and involuntary seizures.

In short, Mr. Lewis had a valid license. He was walking on the street, with no gun, and declining to speak with police. Police knowledge that his license had been suspended in the past,

---

[6] If Defendants are trying to rely on their seizure of Mr. Lewis's license from April 14, 2020 to the end of July 2020, that also fails to amount to reasonable suspicion. That seizure never resulted in even an *attempted* revocation. The license was returned to Mr. Lewis at the end of July 2020, approximately five months before the December stop.

plus Mr. Lewis walking away, do not amount to reasonable suspicion.

### Evidence Now Disproves the Motion to Dismiss Arguments

Mr. Lewis incorporates his arguments opposing the Motion to Dismiss.  The Opposition provides nothing by way of evidence to rebut Plaintiff's allegations, thus essentially conceding the Complaint's truth.  Lewis Affidavit ¶¶ 4-5 (verifying Complaint); *cf.* Opp. (providing only a single exhibit related to December 5, 2020).  Accordingly, the Court can conclude that Defendants violated Mr. Lewis's constitutional rights for the October 10, 2018, December 12, 2018, July 5, 2019, April 14, 2020, and May 9, 2020 incidents based solely on the affidavits and evidence presented in the preliminary injunction briefing.[7]  *See* Local Civil Rule 65.1(c) ("The opposition [to] . . . the application for preliminary injunction . . . shall be accompanied by all affidavits on which the defendant intends to rely.  Supplemental affidavits either to the application or the opposition may be filed only with permission of the Court."); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1261 n.7 (10th Cir. 2016) (granting a preliminary injunction, based in part on the fact that defendant "admitted the factual allegations contained in [portions] of PPAU's complaint for purposes of the preliminary injunction proceedings," and concluding that "it is proper for us to treat these admissions as evidence.").  On this unrebutted evidence, and the

---

[7] The Court should not rely on police memorandums submitted as exhibits to the Motion to Dismiss, as they are unsupported by any affidavit as required by Local Civil Rule 65, constitute hearsay, and represent old, misleading MPD positions.

Defendants ask the Court not to consider affidavits from Mr. Lewis's mentor, and MPD detective grandfather, citing relevance and character evidence objections.  But these affidavits are relevant to the reasonableness of Mr. Lewis's fears, and to the equities at stake.  To the extent the affidavits contain character evidence, they are not presented "to prove that on a particular occasion [in the past] the person acted in accordance with the character or trait," Fed. R. Evid. 404(a)(1), but to assist the Court in evaluating the propriety of relief.  Injunctions are forward looking, *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014), and thus in considering the equities and public interest, the Court may wish to consider Mr. Lewis's trustworthiness and character in the future.

arguments in opposition to the Motion to Dismiss, Mr. Lewis has established that he is likely to prevail on his Second and Fourth Amendment constitutional claims.

It is worth pausing briefly, however, to note where evidence has conclusively established key points.

On May 9, 2020, the evidence proves Mr. Lewis's contention that he was forced to open his car, by Defendant's threat to break into it by force.  Exhibit 17 (video 52) (beginning at 1:38). While Defendants assert without evidence that Mr. Lewis consented of his own free will, the video clearly shows that police told Mr. Lewis that he must either open his car or they would "use this metal pole" to do so.  *Id.*; *See also* Exhibit 18 at DC_DLEWIS-040 (police report for May 9th stating "Vehicle Search Consent: No").

The police report for May 9th also re-confirms what Mr. Lewis has long suspected: the police are targeting him specifically, because he carries guns.  On that day, officers saw Mr. Lewis and simply wondered if he was involved in recent gun crimes.  Ex. 18 at DC_DLEWIS-035 ("Officers were investigating a recent case with multiple firearm's recovery [].  Officers observed [Mr. Lewis] who is known to officers to carry firearms and has been driving the listed vehicle."). Defendants offer no explanation for their claim that a dog sniff indicating the presence of firearms provided probable cause.  Mr. Lewis's guns are registered, and he was in full compliance with licensure laws.  Even on May 9th, during the illegal seizure of his CCL license and CCL-linked firearm, his CCL license was still valid.  *See* Opp. to MTD at 4 (citing 24 DCMR § 2341.3(b).  As Special Police Officer, and with an unrevoked concealed carry license, it was legal for Mr. Lewis to possess registered guns at home, shoot at a gun range, and carry a firearm at work.  Even more to the point, the law allows transportation and storage of a firearm in a vehicle under certain circumstances, D.C. Code § 22-4504.02, and in fact may *require* licensees to store firearms in

vehicles under certain circumstances, including if approaching "private residential property." D.C. Code § 7-2509.07(c),(b).  But the police—knowing that he may "carry firearms" and that a dog alerted to his vehicle, Ex. 18—simply decided that this young African American man must be committing some crime.  Suspicion of possessing guns, standing alone, does not constitute probable cause, and searching on this basis alone is a violation of the Second and Fourth Amendments.  *See* Opp. to MTD at 23-24 (*citing, inter alia*, *United States v. Watson*, 900 F.3d 892, 893 (7th Cir. 2018).

With unrebutted evidence, Mr. Lewis has established that police likely violated his constitutional rights on all six occasions.

### c. Qualified Immunity Is Irrelevant

Next, Defendants contend that qualified immunity shields them from a preliminary injunction.  Opp. 7.  Under that heading, Defendants also assert that none of the named Defendants were present at the December 5, 2020 stop, and that Plaintiff has failed to allege "unconstitutional conduct" by supervisory defendants Newsham and Fitzgerald, suggesting that an injunction would therefore be inappropriate.  *Id.*  at 8.  These fact claims are false, and will be addressed in Section I(d), below.

More importantly, and as a legal matter, qualified immunity is simply not relevant. *Kalka v. Hawk*, 215 F.3d 90, 97 (D.C. Cir. 2000); *Walker v. Jones*, 733 F.2d 923, 933 n. 15 (D.C. Cir. 1984) ("qualified immunity presents no bar to [plaintiff's] claim[s] for injunctive relief."); *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 328 (6th Cir. 2013) ("An official's qualified immunity does not preclude injunctive or declaratory relief."); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018) ("qualified immunity applies only to liability for money damages. . ..").  Qualified immunity is inapplicable.  *See also* Opp. to MTD 30-31.

### d. For Municipal Liability, Evidence Establishes Adoption of a Custom, and Deliberate Indifference

The requirement of showing a municipal policy or custom does apply to injunctive relief, *L.A. Cty. v. Humphries*, 562 U.S. 29, 30-31 (2010), and Mr. Lewis easily satisfies that burden here. *See Long v. District of Columbia*, 469 F.2d 927, 932 (D.C. Cir. 1972) ("If police officers customarily carry out unlawful stop and frisks, it could not be said that the police policy regarding investigatory confrontations was lawful. If a party could prove such an unlawful course of conduct, he would be entitled to an injunction against its continuance.").

Contrary to Defendants' arguments, Mr. Lewis has detailed extensively how the evidence—including his own numerous stops and fruitless efforts to ask police to change—shows two forms of unconstitutional municipal policy: adoption of a custom, and deliberate indifference. Opp. to MTD 31-35. His preliminary injunction application further explained—using District-wide stop data, and detailed case law—how MPD's gun recovery practices are systematized, repetitive, and apply with unequal frequency and error rates to the District's Black residents. P.I. Br. at 16-17. The application also explained how two District laws might be leading officers astray with regard to whether CCL-bearing citizens are required to answer police gun questions. PI Br. 17-18 (comparing D.C. Code § 7-2502.08 to D.C. Code § 7-2509.04(d)).

Evidence and briefing have only made municipal liability more clear, as both officers and their counsel are contending that stopping Mr. Lewis does not necessarily require reasonable suspicion.

Officers show by both their conduct, and words, that reasonable suspicion does not limit their stops of Mr. Lewis. They routinely stop him, suspecting only that he has a gun, and then search him afterwards. This occurred on October 10, 2018, December 12, 2018, July 5, 2019, April 14, 2020, and December 5, 2020. The December incidents may be the most egregious, and

in both cases the officers explain—on video—that they think Mr. Lewis had to stop, answer questions, and submit to a search.  Ex. 14 at 2:50-3:47 (in December 2020, after no gun is found, Mr. Lewis asks "what gun! … I don't have to talk, I don't have to stop, why [are] yall stopping me?" and the officer responds (at 3:00) "you were doing too much."  When Mr. Lewis disagrees and later says (at 3:30) "I don't have to…", another officer says "the officer talking to you, you do [sic]."); Ex. 4 (December 2018 officer conversation and stop).

Even if the Court credits Defendants' claims to reasonable suspicion in one or two instances, Defendant's legal position practically requests the clarity of a judicial injunction.  As to the October 10, 2018 incident, Defendants contend simultaneously that Mr. Lewis was not stopped, MTD Br. at 25, and that he was "require[d]" by "District law" to "declare[] that he had a concealed pistol."  MTD Br. at 23.  The two positions can be squared only by asserting—as officers do—that Mr. Lewis simply has to answer questions when asked, suspicion or no.  Even in opposition to this injunction request, Defendants contend that courts have not "clearly established" whether police may constitutionally stop people merely "to see whether they are carrying a concealed firearm in compliance with applicable regulations." Opp. at 7.

Defendants are also the proper Defendants for an injunction, with the exception of Defendant Newsham.[8]  Defendant Joseph Blasting is visible in the videos of the December 5, 2020 incident, presumably as one "member[] of the Gun Recovery Unit . . . who had prior

---

[8] Defendant Newsham appears to no longer be the Chief of Police as of 2021, removing him from this suit in his official capacity and leaving him only in his personal capacity. https://mpdc.dc.gov/biography/peter-newsham-2016-2020.  Although Defendant Newsham bears personal responsibility for his role in creating these municipal customs, and being deliberately indifferent to constitutional violations, the injunction need not address him—only the Chief of Police in his official capacity, currently Chief Robert Contee, https://mpdc.dc.gov/node/1181821 —since Defendant Newsham would not cause imminent harm, and could not repair ongoing violations.

knowledge" about Mr. Lewis.  *See* Opp. Ex. A.  This is the same Defendant Blasting who helped stopped Mr. Lewis on October 10, 2018, and April 14, 2020.  Compl. ¶ 21; Exhibit 2 (listing Joseph Blasting).  As for Defendant Fitzgerald, the 5D Commander, Mr. Lewis has repeatedly appealed to him in writing; asking him to stop officers' harassing stops and searches, and begging him to inform officers in the neighborhood of his legal gun owner status and responsible citizenship.  *See* Opp. to MTD at 31 n. 10; Exhibit 5 (Letter of July 15, 2019); Exhibit 10 (Letter of June 5, 2020).  All to no avail.  An injunction addressed to these Defendants is eminently appropriate.[9]

Reasonable suspicion is the bedrock of *Terry* jurisprudence.  Contrary to the municipal position, it is *always* required in order to instigate an investigative stop, including when a citizen is exercising Second Amendment rights.  A preliminary injunction would correct Defendants' incorrect view of the law and protect Mr. Lewis.

**II.**  **Mr. Lewis Has Established Irreparable Harm**

As for irreparable harm, Mr. Lewis remains unable to safely exercise his *Wrenn* rights, which "unquestionably constitutes irreparable injury." *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); PI Br. 15-16.  The injury is ongoing and actual, and Defendants' counterarguments all fail.

First Defendants contend that past injury alone is insufficient, citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11 (1995), but leave off the latter portion of *Adarand Constructors*' holding that the plaintiff there *could* seek injunctive relief because the threatened harm was "likely," and plaintiff planned to apply for contracts with a challenged

---

[9] Plaintiff notes that the Complaint contains five John/Jane Doe Defendants, and Mr. Lewis will readily amend the Complaint as necessary to include the December 5, 2020 incident, or as otherwise required in discovery.

clause approximately 1.5 times a year. *Id*. at 211-212. Similarly here, Mr. Lewis would regularly exercise his concealed carry rights, but cannot and does not do so due to Defendants' frequently expressed custom of stopping him just to see if he is following the rules. Lewis Aff. ¶¶ 16-18 ("Since the return of my belongings I have not carried my firearm as much as I want to."); ¶¶ 41-45 (After the December 5th incident, "I now feel completely unable to safely use my concealed carry license. Police have demonstrated time and again carrying my legal concealed pistol makes me a target for dangerous police stops.")

Defendants also contend, on this point, that completely barring Mr. Lewis from "carrying a concealed firearm" would not be a Second Amendment injury. As explained above, this assertion is incompatible with *Wrenn*.

Mr. Lewis's inability to exercise his *Wrenn* rights is particularly clear in light of Defendants' ongoing gun recovery policies.

Ironically, Defendants' only counterargument to their own District-wide data about systemic discrimination against African Americans in stops—including rates of fruitless stops—is to assert that this "does not establish irreparable harm as to plaintiff himself" . . . after they just finished contending that personal allegations alone are insufficient. Opp. 10-11. Here, Mr. Lewis has experienced these statistics repeatedly, across three years. Compl.; Lewis Affidavit.

Nor do Defendants dispute their questionable gun recovery methods evident across numerous cases, PI Br. 17, *see also Gibson*, 366 F. Supp. 3d 14, claiming only that re-occurrence in Mr. Lewis's life is speculative. Opp. 11. But as recounted in Section I above, Defendants know Mr. Lewis personally. They know he would like to carry guns and has done so in the past, and officers on the street have gathered the impression that he is not allowed to do so. They believe that they can stop citizens with guns, simply to ensure that they are carrying a gun

13

legally. In the case of Mr. Lewis, this toxic mix leads to repeated stops without reasonable suspicion, and will do so again unless clarified by the Court. "[T]he loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills*, 571 F.3d at 1312.

### III. The Equities and Public Interest Favor An Injunction

"Injunctive relief against Fourth Amendment violations is appropriate upon proof that such violations have occurred repeatedly and may well continue." *Long*, 469 F.2d at 934 (D.C. Cir. 1972) (J. Wright, concurring) (citing *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966); *Gomez v. Wilson*, 323 F. Supp. 87 (D.D.C.1971)). Courts have often done so when authorities repeatedly ignore reasonable suspicion or believe that it is not required. PI Br. 13-14 (collecting cases). And an injunction is especially valuable when a "crisis in police-community relations persists, and nothing would so directly ameliorate it as a judicial decree forbidding the practices complained of." *Lankford*, 364 F.2d 197, 203-04 (4th Cir. 1966). The ongoing crisis in police-community relations is all too evident in the video evidence here, including the angry, jaded reactions of community members to each of Mr. Lewis's stops.

Defendants cite none of these cases. They offer no direct rebuttal to Mr. Lewis's arguments on the equities and public interests at stake.[10] Instead, they propose two objections that have no relevance.

First, Defendants argue that Mr. Lewis's Proposed Order amounts to an order "requiring general compliance with the law," in violation of the specificity requirement in Fed. R. Civ. P. 65. But the cases they cite have no application on these facts, where Mr. Lewis has provided a detailed proposed injunction. *SEC v. Washington Investment Network*, 475 F.3d 392, 407 (D.C.

---

[10] See note 5 above regarding the Affidavits from Mr. Spriggs and Mr. Boulden.

14

Cir. 2007) (injunction vacated and remanded for additional specificity where it said only "Defendants . . . are enjoined from future violations of Sections 203(f), 206(1), and 206(2) of the Advisers Act."); *Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) (plaintiffs sought only "injunctive relief . . . as the Court deems just"). And Defendants give no answer to the injunctions Plaintiff cites in factually similar circumstances. *See Ligon v. City of New York*, 925 F. Supp. 2d 478, 542 (S.D.N.Y. February 14, 2013); *Bangert v. Hodel*, 705 F. Supp. 643, 656 (D.D.C. 1989); *Nat'l Treasury Emps. Union v. Watkins*, 722 F. Supp. 766, 771 (D.D.C. 1989).

Defendants also claim—without citation—that the specific examples of prohibited conduct Mr. Lewis would have the Court provide are insufficient to create specificity. For the reasons given in the cases above, particularly *Ligon,* that is obviously not true. And even if the Court were inclined to agree with Defendants, Mr. Lewis submits an amended proposed order with even more specificity, as detailed below.

Finally, Defendants make a helpful observation. Contending that they typically search Mr. Lewis to check if "he was not carrying his concealed firearm securely," they say it makes little sense to order them not to search Mr. Lewis on suspicion he possesses a gun "lawfully." Although Mr. Lewis disputes whether their suspicions have been reasonable, the edit is useful. The word "lawfully" should be struck from the proposed injunction, requiring Defendants to "immediately refrain from searching Mr. Lewis's property—to include his car—solely based on suspicion that Mr. Lewis is in possession of firearms or firearm paraphernalia." In tandem with that change, and with the benefit of limited discovery, Mr. Lewis offers an Amended Proposed Order which would inform all relevant officers that Mr. Lewis does in fact possess firearms on several lawful grounds. The amended order appends the following language: "Defendants Fitzgerald and Contee, in their official capacities, are ordered to inform all MPD staff in the Fifth

15

District and in the Gun Recovery Unit that Mr. Lewis is in possession of a valid concealed carry license, that he is a Special Police Officer, and that he is permitted to carry his registered firearms accordingly, so long as he remains in compliance with applicable law."

This is a very narrow injunction.  Compliance will likely be easy for MPD.  But it will mean the world to Mr. Lewis, his safety, and his constitutional rights.  And it would protect District citizens in general, helping build community trust.

## CONCLUSION

To protect the community, clarify the law, and protect Mr. Lewis, a preliminary injunction should be entered.

Respectfully submitted,

**DAQUAN LEWIS**

*/s/ K. Craig Welkener*
K. Craig Welkener, Esq. #1033585
Timothy P. Bosson, Esq. #1029002
Robert Rose, Esq. #1029004
BOSSON LEGAL GROUP, PC
8300 Arlington Blvd., Ste. B2
Fairfax, VA  22031
Ph: (571) 775-2529
Fax: (571) 775-2521
tbosson@bossonlaw.com
cwelkener@bossonlaw.com
rrose@bossonlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on February 4, 2021, I will electronically file the foregoing Reply with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all parties of record, including the following:

ANDREW J. SAINDON
MICAH BLUMING
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 724-6643
(202) 730-1470 (fax)
andy.saindon@dc.gov
micah.bluming@dc.gov

*Counsel for Defendants*

             */s/ K. Craig Welkener*
             K. Craig Welkener